UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Rebecca Geraw (McQueen),

       Plaintiff,

       v.                            Civil Action No. 2:11-CV-32

Commissioner of Social Security,

       Defendant.

## OPINION AND ORDER
(Docs. 8, 12)

       Plaintiff Rebecca Geraw (formerly Rebecca McQueen) brings this action under 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits.  Pending before the Court are Geraw's motion to reverse the decision of the Commissioner (Doc. 8), and the Commissioner's motion to affirm the same (Doc. 12).  For the reasons stated below, the Court GRANTS Geraw's motion, DENIES the Commissioner's motion, and REMANDS the matter for further proceedings and a new decision.

## Background

       Geraw was twenty-one years old on the alleged disability onset date of August 24, 2007[1].  (Administrative Record ("AR") 25, 54, 127, 134, 154.)  She has completed school

---

[1]  In her original application, Geraw alleged a disability onset date of April 10, 2008 (AR 127, 134, 154, 160); but at the administrative hearing, she amended that date to August 24, 2007, the day before her twenty-second birthday (AR 25).

through the eleventh grade, and was pregnant[2] and living on the streets and in shelters at the age of nineteen.  (AR 165, 347, 428, 1003.)  Geraw has held a handful of jobs, all for very short durations of no more than two months, including as a food preparer at a fast food restaurant, a laborer at a temp agency, a stocker at a retail store, a soap-packer at a soap factory, and a paper-loader at a newspaper business.  (AR 43, 161, 474.)

Geraw's parents had a violent and abusive marriage, divorcing when Geraw was seven years old.  (AR 209, 231, 866.)  Geraw lived with her mother thereafter, but was removed from the home when she was nine years old due to chronic neglect.  (*Id.*; *see also* AR 294, 791-92.)  Prior to her removal from her mother's home, Geraw witnessed frequent substance abuse by her mother and violence toward her mother by her mother's boyfriends.  (AR 209, 791, 866.)  Once taken into custody by the State, Geraw was placed in over fourteen foster homes and several intensive residential treatment facilities. (AR 209, 287, 294.)  She has a history of behavioral difficulties in foster homes, at school, and in other institutional settings, including threatening and being assaultive towards her peers, teachers, and foster parents; using physical and verbal aggression to meet her needs and desires; exhibiting dangerous behavior such as trying to jump from a moving vehicle; being sexually inappropriate with her peers; and demonstrating poor personal hygiene.  (AR 209-10, 230-39, 295-96, 792, 797, 800-01, 866-68, 889, 906.) Childhood and adolescent tests demonstrate that Geraw had borderline-to-low cognitive functioning, delayed adaptive behavior skills, and a speech/language deficit.  (AR 230-

---

[2]  Geraw gave up custody of this child to the State, given her lack of housing and income at the time of the child's birth.  (AR 398, 443, 463, 475.)

39, 241, 534-35, 582, 867, 873-74, 933-36, 941.)  In 2004, Geraw acknowledged

polysubstance abuse, including snorting Percocet and Vicodin (AR 309-11), and in 2007,

she was noted to have been using illicit drugs, including marijuana (AR 395).  More

recently, Geraw reported to medical providers that a relative advised her when she was

twenty years old that her father sexually abused her when she was a young child, and that

her father served time in jail for such abuse.  (AR 474, 533.)  She does not remember the

abuse.  (*Id.*)

In January 2009, Geraw protectively filed applications for supplemental security

income ("SSI") and disability insurance benefits ("DIB"), alleging that she was unable to

work due to learning disabilities, depression, anxiety, and a speech impairment.  (AR

127-35, 154, 160.)  The applications were denied initially and on reconsideration, and

Geraw timely requested an administrative hearing, which occurred on July 20, 2010.

(AR 21-51, 54-57, 61-67, 72-79.)  Geraw appeared and testified at the hearing, and was

represented by counsel.  (AR 21-51.)  In addition, vocational expert ("VE") Christine

Spaulding testified at the hearing.  (AR 40-48.)

On August 6, 2010, Administrative Law Judge ("ALJ") Debra Boudreau issued a

decision finding that Geraw was not disabled under the Social Security Act since January

16, 2009, the date her SSI application was filed.  (AR 7-16.)  Thereafter, the Decision

Review Board informed Geraw that it had not completed its review during the prescribed

period, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1-3.)

Having exhausted her administrative remedies, Geraw filed the Complaint in this case on

February 3, 2011.  (*See* Doc. 1.)

**ALJ Determination**

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's "residual functional capacity" ("RFC") precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The fifth and final step requires the ALJ to determine whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional

capacity").

Employing this sequential analysis, ALJ Boudreau first determined that Geraw had not engaged in substantial gainful activity since January 6, 2009, the application date. (AR 9.)  At step two, the ALJ found that Geraw had the following severe impairments: "history of borderline intellectual functioning, depression, anxiety with panic disorder-NOS, and a history of substance abuse in remission."  (*Id.*)  At step three, the ALJ found that Geraw did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  (AR 11.)

Next, the ALJ determined that Geraw had the RFC to perform the full range of work at all exertional levels, but with the following nonexertional limitations:

> [Geraw] is limited to routine, repetitive work in a low stress environment defined as few procedural and schedule changes and where she is given additional support when first learning new tasks.  She is limited to only occasional contact with the general public and then on brief, superficial matters.  She is limited to only occasional interpersonal interaction with co-workers and supervisors, except that she would need additional support when first learning new tasks.

(AR 12-13.)  At step four, the ALJ determined that Geraw had no past relevant work. (AR 14.)  At step five, the ALJ found that, based on the above RFC and testimony from the VE, there were jobs existing in significant numbers in the national economy that Geraw could perform, including cleaner and laundry-worker.  (AR 15.)  The ALJ concluded that Geraw had not been under a disability since January 16, 2009, the date her application was filed.  (*Id.*)

**<u>Standard of Review</u>**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

Although the reviewing court's role with respect to the Commissioner's disability decision is "quite limited[,] and substantial deference is to be afforded the Commissioner's decision," *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quotation marks and citation omitted), the Social Security Act "must be construed liberally because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits," *Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999); *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981) ("In its deliberations the District Court should consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied.").

<u>**Analysis**</u>

**I.     ALJ's Consideration of Medical Opinions**

Geraw contends that the ALJ failed to give appropriate weight to the opinions of examining consulting psychologist Dr. Neil Jepson and examining consulting licensed mental health counselor Sally Edith.  The Commissioner disagrees, and asserts that the ALJ properly gave substantial weight to the opinion of non-examining agency consultant Dr. Thomas Reilly.

Dr. Jepson evaluated Geraw on August 15, 2008, based on information obtained through Geraw's self-reporting, his review of Geraw's medical records, and his examination and testing of Geraw.  (AR 473-76.)  The Doctor noted that a psychological evaluation from 2000 "revealed low-average to borderline functioning across a broad range of verbal domains, including significant deficits in [Geraw's] general fund of knowledge, ability to perform simple mathematical calculations, and abstract thinking

skills." (AR 473-74.) Dr. Jepson diagnosed Geraw with panic disorder with agoraphobia,[3] major depressive disorder, and borderline personality disorder. (AR 437, 475.) Noting that Geraw's work history "ha[d] been very limited as she ha[d] worked at only a few jobs and ha[d] not sustained a job for more than a few weeks," and that she described herself as "avoiding social interactions," the Doctor stated that it was unclear "the degree to which [Geraw's] impaired occupational and social functioning [we]re due to cognitive impairments or to her anxiety and depressive symptoms." (AR 476.) Finally, Dr. Jepson opined as follows:

> While *[Geraw] does not appear to be currently capable of sustaining a job*, it is possible, in my opinion, that she would significantly benefit from individual psychotherapy to address her anxiety, depression, and interpersonal difficulties to a degree that could potentially allow her to work at a job that consisted of simple tasks and allowed for occasional changes in work duties.

(*Id.* (emphasis added).) The ALJ summarized Dr. Jepson's report, but implicitly disregarded his opinion that, as of August 2008, Geraw was incapable of sustaining a job. (AR 10, 14.) The ALJ did not evaluate this particular portion of Dr. Jepson's opinion in any detail, instead merely stating in the context of her evaluation of Dr. Reilly's opinion that Dr. Jepson "considered [Geraw] to be in need of psychotherapy . . . so that she could . . . return to work, [but] [Geraw] ha[d] not sought mental health counseling." (AR 14.)

Likewise, the ALJ did not evaluate a similar opinion by counselor Edith in any detail. Edith met with and evaluated Geraw approximately one year after Dr. Jepson, on

---

[3] "Agoraphobia" is defined as "[a] mental disorder characterized by an irrational fear of leaving the familiar setting of home, or venturing into the open, so pervasive that a large number of external life situations are entered into reluctantly or are avoided; often associated with panic attacks." STEDMAN'S MEDICAL DICTIONARY 40 (28th ed. 2006).

June 3, 2009.  (AR 532-37.)  Similar to Dr. Jepson, she noted that Geraw's 2000

psychological evaluation revealed significant deficits in her general fund of knowledge,

ability to perform simple mathematical calculations, and abstract thinking skills; and that

Geraw had a "very limited" work experience.  (AR 534.)  She further noted that Geraw

had "challenges with her self-care," resulting in, for example, the loss of her teeth

"because [she] did not brush them enough."  (AR 534 (quotation omitted).)  Edith stated

that, despite achieving scores on the Mini-Mental Status Exam ("MMSE") which

indicated no cognitive impairment, Geraw appeared to be "challenged with understanding

abstract concepts" and reported having "considerable challenges with concentration,

reading, and writing[,] and doing simple mathematical tasks."  (AR 536.)  Edith also

stated that Geraw reported "many challenges in self[-]care and daily functioning that

include[d] impaired ability to bath[e] herself and brush her teeth, to cook for herself, and

to shop for her own food"; and reported "significantly impaired interpersonal functioning

including avoidance of all social interactions due to anxiety and affective instability."

(*Id.*)  Edith diagnosed Geraw with post-traumatic stress disorder ("PTSD"), major

depressive disorder, reported learning disorders, and borderline personality disorder (AR

537); and opined as follows:

> While at this time *[Geraw] doe[s] not appear to be capable of securing
> and sustaining a job*, I believe that she would benefit from individual
> psychotherapy to help her manage her panic attacks and past trauma, and
> her anxiety and depression as well as her fears about being out in the world
> and she could eventually potentially work at a job that consisted of clear
> simple tasks in an environment with few co-workers.

(AR 536 (emphasis added)).  Again, the ALJ did not explain why she disregarded Edith's opinion that, as of June 2009, Geraw was incapable of sustaining a job, other than merely stating that Geraw "ha[d] not sought mental health counseling," despite Edith's and Dr. Jepson's statements that Geraw might benefit from doing so.  (AR 14.)

Importantly, neither Dr. Jepson nor Edith unequivocally stated that Geraw would be able to work if she attended psychotherapy.  Rather, each provider surmised that psychotherapy *could have the potential* to benefit Geraw from a work perspective.  On the other hand, although Dr. Jepson and Edith examined and made their opinions about Geraw nearly one year apart, both unambiguously opined that, as of the date of their respective evaluations, it did not appear to them that Geraw was capable of working.

The Commissioner defends the ALJ's decision to disregard Dr. Jepson's and Edith's respective opinions that Geraw was unable to work by arguing that these opinions "would not be considered medical opinions" because the ultimate determination of disability is reserved to the Commissioner.  (Doc. 12 at 8.)  It is true that the ALJ need not credit a medical source's finding that a claimant is disabled, given that the ultimate issue of disability is reserved to the Commissioner.  *Snell v. Apfel*, 177 F.3d 128, 133-34 (2d Cir. 1999) ("The final question of disability is . . . expressly reserved to the Commissioner.").  But it does not follow that the ALJ is thus relieved of her obligation to provide good reasons for rejecting the medical source's opinion as a whole.  The Second Circuit explained: "Reserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability, but it does not exempt administrative decision[-]makers from their obligation .

. . to explain why a treating physician's opinions are not being credited." *Id.* at 134.

There is no reason why this rule would not apply equally to the opinions of medical

sources other than physicians (such as Edith) and to medical sources who examined the

claimant only once and thus do not rise to the level of a "treating" source (such as both

Edith and Dr. Jepson).  In SSR 96-5p, the Social Security Administration explained as

follows:

> The regulations provide that the final responsibility for deciding issues
> such as [whether an individual is "disabled" under the Act] is reserved to
> the Commissioner.
>
> Nevertheless, our rules provide that *adjudicators must always carefully*
> *consider medical source opinions about any issue, including opinions*
> *about issues that are reserved to the Commissioner.* . . .
>
> . . . .
>
> . . . *[O]pinions from any medical source on issues reserved to the*
> *Commissioner must never be ignored.  The adjudicator is required to*
> *evaluate all evidence in the case record that may have a bearing on the*
> *determination or decision of disability, including opinions from medical*
> *sources about issues reserved to the Commissioner.*  If the case record
> contains an opinion from a medical source on an issue reserved to the
> Commissioner, the adjudicator must evaluate all the evidence in the case
> record to determine the extent to which the opinion is supported by the
> record.
>
> In evaluating the opinions of medical sources on issues reserved to the
> Commissioner, the adjudicator must apply the applicable factors in 20
> CFR [§§] 404.1527(d) and 416.927(d).

SSR 96-5p, 1996 WL 374183, at *2-3 (1996) (emphases added).

Applied here, although the ALJ apparently considered the opinions of Dr. Jepson

and counselor Edith, she did not apply the applicable regulatory factors in determining

what weight to afford thereto.  In fact, the ALJ's decision does not state what weight was

afforded to these opinions at all.  On the other hand, the decision clearly states that "substantial weight" was afforded to the opinion of non-examining agency consultant Dr. Reilly.  (AR 14.)  The ALJ explained that Dr. Reilly "provided a carefully reasoned basis for his conclusions after reviewing [Geraw's] educational history and mental health treatment records," and that Dr. Reilly's opinion was supported by that of another non-examining agency consultant, Dr. Joseph Patalano.  (*Id.*)  As discussed below, this explanation was deficient, as the same could be said of the opinions of examining medical sources Dr. Jepson and counselor Edith, which opinions are at least partially supported by the opinion of treating physician Dr. Elizabeth Hill.

The regulations provide that, in general, "more weight" is given to the opinion of a medical source who has examined the claimant than to the opinion of a source who has not.  20 CFR § 404.1527(d)(1); *see Havas v. Bowen*, 804 F.2d 783, 786 (2d Cir. 1986) ("opinions of nonexamining medical personnel cannot in themselves constitute substantial evidence overriding the opinions of examining physicians").  Additionally, while the findings of non-examining analysts can, and often do, provide valuable supplemental support for an ALJ's decision, they should generally be afforded relatively little weight in the overall disability determination.  *See Vargas v. Sullivan*, 898 F.2d 293, 295-96 (2d Cir. 1990) ("The general rule is that . . . reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability.").  Here, although neither Dr. Jepson nor Edith had an ongoing treating relationship with Geraw, they at least examined her on one occasion, as compared to Drs. Reilly and Patalano, who merely reviewed the records in existence at the time of their

reports and formulated opinions based thereon.  The ALJ should have acknowledged this difference and considered its effect on the comparable weight of the medical opinions. *See Velazquez v. Barnhart*, 518 F. Supp. 2d 520, 524 (W.D.N.Y. 2007) ("[a] psychiatric opinion based on a face-to-face interview with the patient is more reliable than an opinion based on a review of a cold, medical record").

Furthermore, the ALJ should have considered the applicable regulatory factors in allocating weight among the opinions of Drs. Reilly, Patalano, Jepson, and Hill, and counselor Edith.  An ALJ is required to "evaluate every medical opinion" according to the regulations, and unless she affords a treating source's opinion "controlling weight," the ALJ must consider certain regulatory factors in deciding what weight to give to each opinion.  20 C.F.R. § 404.1527(d).  Included in those factors are: whether the opinion is based on an examination, the existence of a treatment relationship, the supportability of the opinion, the consistency of the opinion, and the specialization of the source.  20 C.F.R. § 404.1527(d)(1)-(6).  Applied here, the following factors favor the opinion of Dr. Jepson: he examined Geraw on one occasion; his opinion is supported by clinically-acceptable diagnostic procedures; and he specialized in psychology/mental health.  The same factors favor the opinion of counselor Edith, although as a licensed mental health counselor and not a medical doctor or psychologist, she was not an "acceptable medical source."

Moreover, as mentioned above, not only are Dr. Jepson's and counselor Edith's respective opinions that Geraw was unable to work consistent with each other, they are also consistent with the opinion of treating physician Dr. Hill.  In June 2010, Dr. Hill

opined that Geraw was moderately impaired in her ability to understand, remember, and

carry out simple instructions, and *would be absent from work "about 2 days per month"*

due to her mental impairments or treatment.  (AR 987, 989 (emphasis added).)  The ALJ

improperly failed to address the latter portion of this opinion – that Geraw would miss

work approximately two days each month.  This failure was not harmless, considering

that the VE testified that "there would be no jobs" for an employee who was absent from

work two or more days each month.[4]  (AR 47.)  Further, although the ALJ correctly noted

that Dr. Hill's treatment notes indicated that Geraw's depression had "significantly

improved" in the months leading up to and including her June and July 2010

appointments (AR 1002), the ALJ neglected to consider that Dr. Hill's notes also

indicated that Geraw still carried diagnoses of depression with anxiety and PTSD (AR

996, 997, 999, 1000, 1002), and aided Geraw in her efforts to find a suitable psychiatrist,

psychiatric nurse practitioner, or other therapist to treat these mental conditions (AR 996,

1001, 1003).

Finally, Dr. Jepson's and counselor Edith's respective opinions that Geraw was

unable to work, and Dr. Hill's opinion that Geraw would be absent from work twice a

month as a result of her mental impairments, are consistent with the record taken as a

---

[4]  If the ALJ could not ascertain the basis of Dr. Hill's opinion that Geraw's mental impairments would cause her to miss work approximately two days each month, the ALJ should have contacted Dr. Hill for clarification.  *See Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly.") (citing *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998)); SSR 96-5p, 1996 WL 374183, at *6 (1996) ("[I]f the evidence does not support a treating source's opinion . . . and the [ALJ] cannot ascertain the basis of the opinion from the case record, the [ALJ] must make 'every reasonable effort' to re[-]contact the source for clarification of the reasons for the opinion.").

whole, including the medical evidence; Geraw's testimony at the administrative hearing (AR 27-39); and Geraw's self-reporting on social security forms (AR 167-74). Specifically, the record demonstrates that (a) Geraw has significant cognitive deficits, despite achieving normal test results in certain categories; (b) Geraw carries diagnoses of PTSD, major depressive disorder with anxiety, and borderline personality disorder; (c) as a child, Geraw had difficulty residing in shared living spaces and frequently engaged in acts of aggression towards her peers and supervisors; (d) since she was a child, Geraw has had difficulty engaging in personal care activities and maintaining hygiene; (e) Geraw has never held a job for longer than a two-month period; (f) Geraw engages in virtually no activities or hobbies, spending her days sleeping or watching television; (g) Geraw does not prepare her own meals (other than microwaving a pre-made dinner), manage her finances, or drive; (h) Geraw rarely leaves her house; and (i) aside from having a boyfriend with whom she resided at the time of the administrative hearing, Geraw has virtually no social life and no friends or family.

Finally, it is noteworthy that Dr. Reilly's latest report was completed in July 2009 and Dr. Patalano's in August 2009, approximately one year prior to Dr. Hill making her June 2010 opinion that Geraw would miss two days of work each month due to her mental impairments. Therefore, Drs. Reilly and Patalano could not have considered Dr. Hill's opinion in their reports. The ALJ at least should have acknowledged this fact in her decision, noting its effect on the weight afforded to each opinion. *See, e.g., Tarsia v. Astrue*, No. 10-610-cv, 2011 WL 1313699, at *2 (2d Cir. Apr. 7, 2011) (ALJ erred in placing "substantial weight" on non-examining physician's opinion where it was unclear

15

whether that physician reviewed all the relevant medical evidence); *Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995) (agency consultative physician reports cannot constitute substantial evidence to support ALJ's decision when they were not based on the full record, which included medical records prepared subsequent to the consultative physician's report).

For these reasons, Geraw's claim should be remanded to the Commissioner to re-weigh the relevant medical evidence in accordance with the applicable laws and regulations. To the extent that the Commissioner finds any of the medical assessments discussed herein unclear regarding the extent of Geraw's mental limitations, or if the Commissioner finds that Dr. Reilly's or Dr. Patalano's respective opinions might be weighed differently if they included consideration of Dr. Hill's June 2010 opinion, the applicable medical sources should be re-contacted.

## II.     ALJ's Credibility Assessment

On remand, the ALJ should also make a new assessment of Geraw's credibility. It is the province of the Commissioner and not the reviewing court to "appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). Thus, if the Commissioner's credibility findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints. *Id.* (citing *McLaughlin v. Sec'y of Health, Educ., and Welfare*, 612 F.2d 701, 704 (2d Cir. 1982)). "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p,

1996 WL 374186, at *4 (July 2, 1996).  These reasons "must be grounded in the evidence and articulated in the determination or decision."  *Id.*

Here, the ALJ's reasons for determining that Geraw was not credible are not supported by the evidence of record.  Specifically, the ALJ found as follows:

> [Geraw's] veracity is called into question by the conflict between her testimony that she spends as many as 3 days a week confined to bed and her self-report to Dr. Hill that her symptoms were controlled with her medication.  Her assertion that she has difficulty even remembering to perform simple tasks is also inconsistent with her activities which include serving as a strong advocate of her own health care as for example where she commented that she was not happy with a prior service because she always was treated by different providers.  Moreover, [Geraw] has not been described as having any difficulty comprehending and following instructions provided by her treatment providers.  (Exhibit 20F.)  She has had no problems communicating with providers or remembering past events.  Finally, . . . [Geraw] has testified to having been referred for speech and language therapy, but there is no evidence in her medical records that she has been referred.

(AR 14.)  With one minor exception, the ALJ does not cite to any evidence in the record to support these critical findings.  Moreover, the findings are unsupported for the following reasons.

First, it is unclear why Geraw's statement that she "sometimes" spends "like three days a week" in bed, [not] do[ing] anything" (AR 37), necessarily precludes her from honestly reporting to a medical provider that her symptoms are controlled with medication (AR 996, 999).  It is at least possible that confining herself to bed is one way in which Geraw controls her symptoms of depression, anxiety, and agoraphobia, in addition to treating these symptoms with medication.  Second, the ALJ fails to explain why it is implausible that one could have trouble remembering to perform simple tasks

while at the same time advocating for her own health care, and more specifically, requesting that she be seen by the same medical provider at each appointment.  In any event, the treatment note implicitly referenced in the ALJ's decision on this point reveals that Geraw was not at all effective in "advocat[ing] [for] her own health care."  (AR 14.) That note states that, after complaining about another treatment system because "she was seeing a new doctor every single time she went there [and] . . . felt as though the physicians did not know her and needed to start from the beginning each time," Geraw was advised that "there is a high likelihood that she will experience the same unsatisfactory treatment here for she will be seeing different physicians."  (AR 1002.) The note further states that, in response, Geraw stated that she "would like to continue with her care there."  (*Id.*)  Clearly, Geraw did not achieve the desired result, i.e., seeing the same physician at each prospective appointment, and the ALJ's finding that Geraw was a "strong advocate of her own health care" rings hollow.

Next, the ALJ's finding that Geraw's credibility "is called into question" because none of her treatment providers described her as having trouble understanding and following instructions and because she had no difficulty communicating with providers or remembering past events, is unsupported.  (AR 14.)  First, treatment providers would not necessarily know whether Geraw had trouble understanding or following their instructions, and thus they would not have occasion to include these observations in their treatment notes.  Second, in fact, Dr. Jepson and counselor Edith each separately indicated in their respective consultative reports that Geraw had trouble remembering past events.  Dr. Jepson stated: "[Geraw] demonstrated some significant impairment for

recall of important details for remote events." (AR 476.) And counselor Edith stated: "[Geraw] had some difficulty remembering time frames and details of past events in her life." (AR 535.)

Finally, the ALJ supported her credibility determination by stating that Geraw testified to having been referred for speech and language therapy, but there is no evidence in her medical records demonstrating that she has been so referred. (AR 14.) First, it is plausible that there would be no evidence of these referrals in the record, as they may not have been documented. Second, the relevancy of Geraw's speech and language problems is questionable with respect to her clearly more severe impairments, including borderline intellectual functioning, depression, and anxiety. Third, the record does document that Geraw had speech and language problems as a child, although they do not appear to have been significantly functionally limiting. (*See, e.g.,* AR 241, 290-92, 867, 874, 934.)

In general, reports from Geraw's consulting and treating medical providers support a positive credibility finding. For example, Dr. Jepson found that, despite the memory problems mentioned above, Geraw "appeared to be an adequately reliable historian." (AR 473.) And counselor Edith found that, again, despite the memory issues discussed above, "[Geraw] was doing her best to answer [her] questions honestly and to the best of her ability." (AR 533.) Edith continued: "There was no evidence in today's interview to warrant the questioning of intentional falsehood or malingering." (*Id.*) Even agency consultant Dr. Reilly stated that, at least in the context of reporting "significant agoraphobia," Geraw was "seemingly credible." (AR 540.) Furthermore, a June 2010 treatment note from Dr. Hill supports Geraw's assertion that she was unable to work with

others due to problems with aggression and that she had problems with dental hygiene. Specifically, the note states that Geraw reported she had recently been fired from a job "due to aggressive behavior on her part and verbal abuse to others," and that all of her teeth had been extracted "secondary to poor dental hygiene."  (AR 1002.)

## III.    Hypothetical to Vocational Expert

Geraw argues that the ALJ erred in posing a hypothetical to the VE that "assumed a reasonable accommodation."  (Doc. 8 at 9.)  In support of this argument, Geraw cites exclusively to *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999), a case which does not address the propriety of a hypothetical question in the context of a social security DIB claim.  Therefore, Geraw's argument fails.  Nonetheless, on remand, after re-assessing Geraw's credibility and the weight of the medical evidence, the ALJ should pose a new hypothetical to the VE, which shall "present the full extent of" Geraw's disabilities.  *De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984).  If the ALJ does not include Dr. Hill's two-day-a-month-absence from work in the hypothetical, she should explain in her decision why such limitation has been omitted.

<u>Conclusion</u>

For these reasons, Geraw's motion (Doc. 8) is GRANTED, and the Commissioner's motion (Doc. 12) is DENIED.  Accordingly, the Court REVERSES the decision of the Commissioner and REMANDS under sentence four of 42 U.S.C. § 405(g) for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 20th day of December, 2011.

/s/ John M. Conroy_____

John M. Conroy
United States Magistrate Judge